GEORGE J. GIANARIS AND CAMILLE GIANARIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; HARMONIC ASSOCIATES, LIMITED PARTNERSHIP, WINSTON FROST, TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gianaris v. Commissioner
Docket Nos. 8234-87, 21142-89
United States Tax Court
T.C. Memo 1992-642; 1992 Tax Ct. Memo LEXIS 670; 64 T.C.M. (CCH) 1229; T.C.M. (RIA) 92642; November 3, 1992, Filed The two partnerships at issue purchased and leased certain energy conservation equipment, at prices grossly exceeding the market prices for identical or similar equipment. The energy conservation equipment was installed at the plants of end-users, in consideration for a portion of the energy savings generated thereby. The economic projections of the partnerships anticipate nominal receipts in excess of anticipated costs. The discounted present values of those projected receipts, however, do not exceed anticipated costs. Held: Each of the partnerships at issue lacked a profit objective, as required by sec. 183, I.R.C. Respondent's deficiencies are therefore sustained. For Petitioners: Richard P. Swanson and Edward Scarvalone (specially recognized). For Respondent: Jane B. Wilson, Peter J. Graziano, and Maria Stabile. HALPERN
HALPERN
MEMORANDUM FINDINGS OF FACT AND OPINION HALPERN, Judge: By notice of deficiency dated January 15, 1987, respondent determined deficiencies in petitioners George and Camille Gianaris' Federal income taxes for 1980 and 1981, along with an addition to tax for 1981, and increased interest for both years. By notice of final *671 partnership administrative adjustment (FPAA) dated July 17, 1989, respondent made certain adjustments to the partnership return of Harmonic Associates, Limited Partnership (Harmonic), Winston Frost (Frost), Tax Matters Partner, for 1982. The two cases are part of a litigation management project known as "Energy Management Systems", which project addresses certain common questions regarding partnership investments. The first case was selected for trial by respondent, while the second case was selected for trial by counsel for the taxpayers participating in the project. The cases have been consolidated for trial, briefing, and opinion. By order of the Court, trial was limited to two issues, relevant to both cases: (1) Whether respondent's adjustments should be sustained on the ground that the partnerships at issue lacked a profit objective, as required by section 183, and (2) whether respondent's adjustments should be sustained, in part, on the ground that the partnerships' investments were only at risk to a limited extent, under the rules of section 465. Because we answer the first question in respondent's favor, we need not, and do not, reach the second question. The result *672 here should be helpful in resolving the similar questions presented in the other cases that are part of the Energy Management Systems project. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954 in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some facts have been stipulated and are so found. The stipulation of facts filed by the parties and accompanying exhibits are incorporated by this reference. I. George J. Gianaris and Camille Gianaris, Docket No. 8234-87
The Gianarises resided in Rye, New York, at the time they filed their petition in this case. A. Computerized Energy Associates
Computerized Energy Associates (CEA) is a Connecticut limited partnership, organized in 1980, with 1 general partner and 35 limited partners. George J. Gianaris (Gianaris) is a limited partner and has a 2.475-percent interest in CEA. Frost is the General Partner of CEA and holds a 1-percent interest therein. CEA's ostensible objective was to earn an economic profit through the installation and management of energy conservation equipment at two manufacturing plants: *673 (1) GSF Corp. (GSF), a manufacturer of foam mattresses, located in Andover, Massachusetts, and (2) Progress Industries, Inc. (Progress), a manufacturer of storage tanks, located in Arthur, Illinois. 1. GSF
GSF manufactured foam rubber by means of a chemical process, and operated electricity-driven machinery to cut the foam rubber that it manufactured. Electricity was also used to operate the ventilation fans used in the manufacturing facility, and to heat (via baseboard heating) and cool (via air conditioning) the adjacent office building. Fuel oil was consumed in heating the manufacturing facility. The plant's hot water boiler, which ran on fuel oil, furnished hot water that was circulated through pipes that ran throughout the manufacturing facility. Heat was transferred from the pipes to the surrounding air by means of blowers, which blew across coils through which the hot water flowed. The equipment installed at GSF consisted of three key components: (1) A Pacific Technology "Basic 8" load programmer (the Basic 8), (2) an Ista boiler control, and (3) timer controls for the exhaust fans used in the manufacturing facility. The Basic 8 reduced consumption of fuel oil *674 by sending time-based commands to the heat blowers located throughout the manufacturing facility, instructing them to operate only during hours of plant operation. The Basic 8 also regulated the operation of the office building's baseboard heating and air conditioning, both of which operated on electricity, by regulating their hours of operation. Consequently, GSF did not need to operate all of its electricity-driven equipment at once, thereby avoiding additional demand charges imposed by its electricity supplier. The Ista boiler control was a device installed on the boiler that caused the boiler to heat the circulated water to a lower temperature (set point) on evenings and weekends. The boiler therefore fired less and used less fuel oil. The Ista boiler control also saved fuel oil by means of an ambient temperature sensor, which automatically lowered the boiler's set point whenever the outside temperature moderated. 2. Progress
Progress was a manufacturer of storage tanks, silos, and truck tank bodies. Progress' major energy expense was its winter heating system. CEA intended to reduce that expense through the installation of a microprocessor-controlled unit governing *675 the facility's heating. The proposed system also included changes in the location of heating units and the addition of infra-red units to improve heating efficiency. B. The CEA Offering
Limited partnership interests in CEA were offered by means of a private placement memorandum (the CEA offering memorandum). The purpose of the offering was to raise $ 800,000 in capital through the sale of 16 limited partnership units at a price of $ 50,000 a unit. 1. Acquiring the Equipment
The CEA offering memorandum states that CEA will purchase certain energy conservation equipment (the CEA equipment) from Danison Enterprises, Ltd. (Danison). As stated in the CEA offering memorandum, CEA was to provide the following in consideration for the CEA equipment, such consideration (ostensibly) totaling $ 6 million: (1) Cash, in the amount of $ 380,000, due upon closing, (2) a recourse note in the amount of $ 400,000, due April 30, 1981, and (3) a nonrecourse note, in the amount of $ 5,220,000, with interest at the rate of 9 percent per annum, payments of principal and interest due quarterly, to the extent of (and only to the extent of) 80 percent of the net income realized by CEA. [1] *676 The CEA offering memorandum states that Danison acquired the CEA equipment from Brogel, Ltd. (Brogel), for a total purchase price of $ 5,389,700, of which $ 169,700 was paid in cash and the balance by way of a nonrecourse note identical to that to be given by CEA to Danison (with such CEA note to be assigned by Danison to Brogel as collateral). The CEA offering memorandum is silent as to how Brogel acquired the CEA equipment. Brogel acquired the CEA equipment from Energy Master, Inc. (Energy Master), on a turnkey basis, for $ 169,700. 2. The Fee Structure
The CEA offering memorandum states that CEA is to enter into an agreement with a management company, Associated Energy Consultants, Inc. (AEC), that, previously, had entered into management agreements with GSF and Progress. Under the terms of the agreement with AEC, CEA is to receive 50 percent of the dollar value of the energy savings produced by the CEA equipment, and *677 to pay 15 percent of such receipts to AEC as a management fee. [2] Taking into account CEA's obligation to pay 80 percent of net income to Danison, CEA was to be entitled to keep 20 percent of 85 percent of 50 percent, which comes to 8.5 percent, of any savings generated by the CEA equipment (until such time as the note to Danison might be paid off). 3. Economic Projections
The CEA offering memorandum contains cash-flow and economic projections for the years 1980 to 2005. Those projections are predicated upon the assumptions that: (1) The predicted level of energy conservation would be achieved; (2) the cost of energy would increase 20 percent per *678 annum between 1980 and 2005; and (3) the CEA equipment would remain useful for that 25-year period. Those projections predict total pretax receipts of $ 19,476,911 (taking into account the 15-percent management fee, but not CEA's obligations to Danison). Nowhere does the CEA offering memorandum calculate the discounted present value of those estimated receipts. The projected tax benefits are substantial. II. Harmonic Associates, Limited Partnership, Winston Frost, Tax Matters Partner, Docket No. 21142-89
Petitioner, Frost, resided in New York City, New York, at the time he filed the petition in this case. Frost is the tax matters partner of Harmonic. A. Harmonic
Harmonic is a Florida limited partnership, organized in 1982, with 1 general partner and 51 limited partners. Harmonic's ostensible objective was to earn an economic profit through the installation and management of energy conservation equipment at the National Rolling Mills (NRM) steel plant located in Malvern, Pennsylvania. NRM is a steel finishing and manufacturing plant located in Malvern, Pennsylvania. NRM purchases hot rolled steel bands and produces a line of cold rolled steel products for a wide *679 range of industries. NRM also manufactures steel acoustical suspension systems for the building industry. The processing and treatment of rolled steel at NRM requires the application of high levels of heat in ovens known as annealing furnaces. Coils of steel are stacked and then heated to an average temperature of 1200 degrees Fahrenheit. They remain at that temperature for 7 to 12 hours, while the steel is soaked. NRM uses natural gas to fire the annealing furnaces. NRM's treatment of rolled steel also involves other processes, including plating, cleaning, and pickling. Prior to the installation, by Harmonic, of energy conservation equipment, NRM used a central boiler plant to generate steam to run those processes. The central boiler plant burned natural gas as its primary source of fuel, with number two fuel oil as a backup source. Harmonic intended to generate energy savings at NRM by: (1) Retrofitting one of NRM's annealing furnaces with controls, a heat recovery recuperation system, and ancillary controls (collectively, the annealing furnace retrofit); and (2) replacing NRM's boiler plant with a boiler that would burn woodchips and other nonfossil fuels (the woodchip *680 boiler). The annealing furnace retrofit was intended to enable the furnace to burn more efficiently, thereby reducing NRM's consumption of natural gas. The replacement of NRM's natural gas-fired boiler with one that uses woodchips was intended to reduce costs, inasmuch as woodchips are relatively abundant and inexpensive, compared to natural gas. The annealing furnace retrofit and the woodchip boiler shall hereinafter be referred to as the NRM equipment. C. The Harmonic Offering
Limited partnership interests in Harmonic were offered by means of a private placement memorandum (the Harmonic offering memorandum). The purpose of the offering was to raise $ 2,400,000 in capital through the sale of 24 limited partnership units, at a price of $ 100,000 a unit. 1. Acquiring the Equipment
The Harmonic offering memorandum states that Harmonic will, at closing, enter into a lease agreement with Golden Energy, Inc. (Golden), whereby Harmonic will lease the NRM equipment from Golden. As stated in the Harmonic offering memorandum, the term of the lease is 7 years and Harmonic is to pay the following to Golden: (1) Guaranteed rent of $ 1,026,000, due at closing; (2) guaranteed *681 rent of $ 1,026,000, due on May 31, 1983, with 10-percent interest; and (3) 85 percent of its gross rental receipts (after deducting the management fee and any sales taxes included). The Harmonic offering memorandum also states that, in consideration of $ 288,000 (consisting of a $ 144,000 payment due at closing and a $ 144,000 note, bearing interest at a rate of 10 percent, due May 31, 1983), Harmonic will be granted the option, pursuant to the lease with Golden, of purchasing the NRM equipment at the conclusion of the 7-year lease term for $ 24,250,000, less 75 percent of all rental payments made during the lease term. [3]
*682 The Harmonic offering memorandum further states that Golden has agreed to purchase the NRM equipment from Ben Energy, a (then) recently formed Delaware corporation, for the following consideration (ostensibly) totaling $ 24,250,000: (1) Cash, in the amount of $ 931,875, due at closing; (2) a recourse note, in the amount of $ 990,000, bearing interest at 10 percent per annum, due June 30, 1983; and (3) an (ostensibly) recourse note, in the amount of $ 22,328,125, bearing interest at 9 percent per annum, due December 10, 2017, and payable solely from (1) 90 percent of Golden's gross rental income (in excess of guaranteed payments and after deducting insurance costs), and (2) income from the sale (or other use) of the NRM equipment after the lease term. The Harmonic offering memorandum states that the $ 22,328,125 note would be personally guaranteed by Mr. Preston Golden, the sole stockholder of Ben Energy. The Harmonic offering memorandum further states that Ben Energy will obtain the NRM equipment from Energy Consultants International, Inc. (ECII), which was to assemble such equipment. Ben Energy was to pay ECII the following consideration for the NRM equipment (ostensibly) totaling *683 $ 11,764,062: (1) $ 600,000 in progress payments, commencing with closing and continuing through final installation; (2) a nonrecourse obligation for $ 11,164,062, bearing no interest, due December 10, 2017, and payable solely from 50 percent of Ben Energy's gross receipts derived from the NRM equipment. That nonrecourse obligation was to be secured by a security interest in the NRM equipment. The Harmonic offering memorandum does not state from whom or at what price ECII purchased the NRM equipment. 2. The Fee Structure
The Harmonic offering memorandum states that Harmonic is to enter into an agreement with a management company, Kenergy Corp. (Kenergy), that, previously, had entered into a management agreement with NRM. Under the terms of that agreement, NRM is to pay to Kenergy 50 percent of the dollar value of the energy savings resulting to it. Kenergy is to retain 20 percent of what it receives and is to remit the remaining 80 percent to Harmonic. [4] Taking into account Harmonic's obligation to Golden, Harmonic was to be entitled to 15 percent of 80 percent of 50 percent, which comes to 6.0 percent, of any savings generated by the NRM equipment. *684 3. Economic Projections
The Harmonic offering memorandum contains cash-flow and economic projections for the years 1982 to 2017. Those projections are predicated upon the assumptions that: (1) The projected level of energy conservation would be achieved; (2) the cost of energy would increase 15 percent per annum between 1982 and 2017; and (3) the NRM equipment would remain useful for that 35-year period. Harmonic's projections -- assuming exercise of the purchase option -- forecast total pretax receipts of $ 80,370,500 (taking into account the management fee but not rent, option, or purchase price payments to Golden). Nowhere does Harmonic's offering memorandum calculate the discounted present value of those estimated receipts. The projected tax benefits are substantial. ULTIMATE FINDINGS OF FACT 1. When discounted to present value, CEA's economic projections forecast a negative cash-flow. 2. CEA grossly overpaid for the CEA equipment. 3. CEA did not have a profit objective. 4. When discounted to present value, Harmonic's economic projections forecast a negative cash-flow. 5. Harmonic grossly overpaid for use of the NRM equipment. 6. Harmonic did not have a *685 profit objective. OPINION Profit Motive
A. The Legal Standard
Section 183(a) provides that "if * * * [an] activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Simply put, an individual must engage in an activity with the actual and honest objective of making a profit. Dreicer v. Commissioner, 78 T.C. 642, 646 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983). That requirement extends to activities carried out by way of a partnership.[5]
*686 The determination of whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. Brannen v. Commissioner, 78 T.C. 471, 506 (1982), affd. 722 F.2d 695 (11th Cir. 1984); sec. 1.183-2(b), Income Tax Regs. The objective facts are to be accorded greater weight than petitioner's own statements of intent. Brannen v. Commissioner, supra at 506; sec. 1.183-2(a), Income Tax Regs.
The taxpayer's objective must be to achieve an economic profit independent of tax considerations. Hulter v. Commissioner, 91 T.C. 371, 373 (1988). In the partnership context, that determination is made at the partnership level. Hulter v. Commissioner, supra at 393; Brannen v Commissioner, supra at 505 n.14. Specifically, we must look to those individuals running the partnership and whose expertise is relied upon in making partnership decisions. Hulter v. Commissioner, supra at 393; *687 Fox v. Commissioner, 80 T.C. 972, 1007-1008 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner, 734 F.2d 5-7, 9 (3d Cir. 1984). B. Present Value Analysis
Respondent argues that, even if all assumptions stated in the CEA and Harmonic offering memoranda were reasonable, and no matter how diligently those partnerships may have pursued the revenue goals set forth in those respective memoranda, CEA and Harmonic nonetheless lacked any reasonable possibility of a profit independent of tax considerations, because their discounted cash-flows (disregarding tax considerations) would have been negative. [6] We agree with respondent. *688 1. Whether Discounting Is Appropriate
In asking that we analyze cash-flow to determine whether either CEA or Harmonic had any reasonable prospect of making a profit, respondent asks nothing more than that we compare projected receipts and expenditures (positive and negative cash-flows) to determine whether any profit (net positive cash-flow) could be expected. Respondent further asks that we account for timing differences in individual receipts and expenditures by discounting to present values anticipated future cash-flows. Such discounting is necessary to take account of the time value of money, or, to put it most simply, to take account of the indisputable fact that a dollar to be received tomorrow does not have the same present worth as a dollar received today. [7]
*689 Generally, a financial investment will require one or more cash payments and will produce one or more cash returns. Net present value (net cash-flow) is the sum of the initial investment (a negative cash-flow) plus the present values of future cash-flows (which may be either negative or positive). [8] If net present value is positive, the investment is profitable, and a profit-seeking investor would pursue it. If net present value is zero, the investment is neither profitable nor unprofitable, and a profit-seeking investor would be indifferent to it. If net present value is negative, the investment is unprofitable, and a profit-seeking investor would avoid it. [9]
*690 The discounted cash-flow analysis suggested by respondent is not a novel approach in determining profit potential. Indeed, it is a fundamental tool of financial analysis. See, e.g., Brealey & Myers, Principles of Corporate Finance, chs. 2 and 3 (3d ed. 1988). Moreover, in other cases involving energy management systems, we have consistently discounted the income streams produced thereby, in determining whether the taxpayer had a profit objective. See, e.g., Soriano v. Commissioner, 90 T.C. 44, 55-56 (1988); Keenan v. Commissioner, T.C. Memo. 1989-300. Petitioners offer various arguments for eschewing any present value analysis, none of which merits discussion. 2. The Appropriate Discount Rate
Petitioners argue that "the projections in issue did apply an interest factor to an interest-bearing note, which accomplishes the discounting function." Petitioners continue: As is clear from the face of the Harmonic and Computerized Energy projections, the payment of interest and principal due in connection with the purchase note is less than the total revenues that the partnership receives from the energy savings. *691 The taking into account of the payment of interest is a valid way of applying a discount rate to the income stream. Even after the payment of interest, the partnership shows a profit from the purchase of its energy management system. Petitioners' argument is flawed. Petitioners are asking us to compare the total of anticipated positive cash-flows to the total of anticipated negative cash-flows and to conclude that, since the latter is smaller than the former, and the latter, in part, is denominated as interest, the net present value of the combined cash-flows is positive. That we cannot do. Our concern for timing differences is not satisfied simply because certain future (negative) cash-flows have been designated as payments of interest. Timing differences are eliminated by discounting all future cash-flows (whether designated as interest or principal, and whether positive or negative) to their present values. [10] That petitioners have failed to do. *692 Respondent's experts, Susan Haselhorst (Haselhorst) and Mark Rodekohr (Rodekohr), have testified that a profit-seeking investor in CEA or Harmonic would reasonably have required a rate of return of no less than 15 percent. Those experts testified, and petitioners do not challenge, that long-term U.S. Government bonds yielded, on average, about 11.5 or 11.6 percent in 1980 and 13 percent in 1982. U.S. Government bonds generally are considered a risk-free investment. Non-U.S. Government debt of an equivalent term, issued at the same time, normally carries a higher rate of interest, to compensate for the additional risk generally thought to attach to such debt. Respondent's experts emphasize that investors would require a premium, above the bench-mark rate of return on U.S. Government debt, to compensate for the additional risk involved in an investment such as CEA or Harmonic. We agree. It is clear, therefore, that profit-seeking investors in CEA and Harmonic would have required rates of return in excess of 11.5 and 13 percent, respectively. Nevertheless, for the purpose of our calculations, we will assume discount rates for CEA and Harmonic of 11.5 and 13 percent, respectively. *693 Of course, such rates are unduly favorable to petitioners, inasmuch as they lack any risk premium above that appropriate for long-term U.S. Government bonds. If petitioners' investments do not show profit (positive net present value) at such interest rates, certainly they would not show profit at the higher rates it can be assumed a profit-seeking investor would demand. [11]
*694 3. The Calculations
a. CEA
Accepting, arguendo, the projections as set forth in the CEA offering memorandum, and applying a discount rate of 11.5 percent, we have calculated the net present values, as of 1980, of (i) CEA's up-front payments, and (ii) CEA's net receipts (taking into account further payments to Danison and all other fees). Having found the net present value, as of 1980, of the up-front payments to exceed the net present value of the net receipts by $ 514, we have determined CEA's net cash-flow to be negative $ 514. [12] The details of that conclusion are set forth in appendix A. Inasmuch as CEA's projected net cash-flow (disregarding tax considerations) is negative, it is clear that CEA could not reasonably have hoped to recoup its investment in the CEA equipment, much less earn an economic profit independent of tax considerations. Accordingly, we find that CEA lacked a profit objective for purposes of section 183. *695 b. Harmonic
Accepting, arguendo, the projections as set forth in Harmonic's offering memorandum, and applying a discount rate of 13 percent, we have calculated the net present values, as of 1982, of (i) Harmonic's projected payments to Golden, and (ii) Harmonic's gross receipts. Having found the net present value, as of 1982, of the projected payments to Golden to exceed the net present value of the gross receipts by $ 1,040,194, we have determined Harmonic's net cash-flow to be negative $ 1,040,194. The details of that conclusion are set forth in appendix B. Inasmuch as Harmonic's projected net cash-flow (disregarding tax considerations) is negative, it is clear that Harmonic could not reasonably have hoped to recoup its investment in the Harmonic equipment, much less earn an economic profit independent of tax considerations. Accordingly, we find that Harmonic lacked a profit objective for purposes of section 183. C. The Fair Market Value of the Equipment
Our conclusion that CEA and Harmonic lacked a profit objective is bolstered by our determination that, in both cases, the price of the energy conservation equipment was grossly inflated. The equipment for which *696 CEA purportedly paid $ 6 million was originally purchased by Brogel from Energy Master for $ 169,700. Moreover, Haselhorst testified that there was an active market on which comparable (or identical) equipment could have been purchased for approximately $ 163,330 in 1980. Petitioners have not challenged that conclusion. Respondent therefore contends that the fair market value of the CEA equipment must be no more than $ 169,700. As for the NRM equipment, Haselhorst testified that there was an active market on which comparable (or identical) equipment could have been purchased for approximately $ 645,950 in 1982. Petitioners have not challenged that conclusion. Respondent therefore contends that the fair market value of the equipment must be no more than $ 645,950. In each case, petitioners' only response is that the partnerships did not overpay for the equipment because the (projected) revenues to the partnerships were to exceed the purchase price of the equipment. Petitioners misunderstand the notion of fair market value. Fair market value is the price that would be reached by a willing buyer and a willing seller, where neither is under any compulsion to buy or sell. Chiu v. Commissioner, 84 T.C. 722, 730 (1985); *697 sec. 1.170A-1(c)(2), Income Tax Regs.[13] Accordingly, we find that the fair market values of the CEA and NRM equipment were no more than $ 169,700 and $ 645,950, respectively.
It is therefore clear that both CEA and Harmonic dramatically overpaid for their equipment. Such gross overpayments exclude the possibility of mere business error: we think it obvious that, if CEA and Harmonic were seeking an economic profit, they would not have entered into those arrangements. Indeed, the only rational reason for doing so would be to achieve grossly inflated tax benefits. Consequently, even if the partnerships' discounted projections suggested some reasonable profit potential, their gross overpayment for equipment would seem inconsistent with a profit *698 objective. D. Reasonableness of Assumptions and Diligence of the Partnerships Irrelevant
Much of the record consists of expert reports, expert testimony, and other evidence as to whether the partnerships at issue: (1) Carefully examined and sought (and obtained) assistance in verifying the assumptions underlying the offerings; (2) visited and examined the end-user sites; (3) diligently acted, both before and after the installation, to maximize energy savings generated by the equipment; and (4) diligently acted to collect compensation due under the agreements with the end-user and the management companies. Here, that evidence is irrelevant: even if we were to resolve all those doubts in favor of the partnerships, we would still conclude that neither had a profit objective. Both offering memoranda make clear -- once present value analysis is applied -- that, even accepting all assumptions, no amount of diligence could have been expected to produce an economic profit. Similarly, each partnership's gross overpayment for the equipment involved in inconsistent with the possibility that that partnership's motivation was earning an economic profit. E. Conclusion
We find that *699 neither CEA nor Harmonic had a profit objective within the meaning of section 183 and sustain respondent's deficiencies, to the extent here in dispute, on that ground. An appropriate order will be entered. APPENDIX A I. Discounted Receipts
Year
Projected Nominal Receipts [1]
1980 Present Value [2]
1980
$       0  $     0  1981
4,165
3,735
1982
9,914
7,974
1983
11,897
8,582
1984
14,277
9,237
1985
17,132
9,941
1986
20,558
10,699
1987
24,670
11,514
1988
29,604
12,392
1989
35,525
13,338
1990
42,630
14,354
1991
51,156
15,448
1992
61,387
16,626
1993
73,664
17,893
1994
88,397
19,257
1995
106,077
20,725
1996
127,292
22,305
1997
152,750
24,005
1998
183,300
25,835
1999
219,960
27,805
2000
263,952
29,925
2001
316,743
32,206
2002
380,091
34,661
2003
456,110
37,303
2004
1,314,667
96,432
2005
3,283,990
216,038
Total
Receipts:
$ 7,289,908
$ 738,230
*700 II. Discounted Costs
Year
Nominal Costs
1980 Present Value
1980
$ (380,000)
$ (380,000)
1981
(400,000)
(358,744)
Total
Costs:
$ (780,000)
$ (738,744)
III. Discounted Net Cash-flow
Discounted Receipts:
$  738,230 Discounted Costs   :
(738,744)
Discounted Net Cash-flow
$     (514)
APPENDIX B I. Discounted Receipts
Year
Projected Nominal Receipts
1982 Present Value [1]
1982
$        0  $       0  1983
7,814
6,915
1984
105,800
82,857
1985
121,670
84,323
1986
139,921
85,816
1987
160,909
87,335
1988
185,045
88,881
1989
202,395
86,030
1990
36,708
13,808
1991
42,214
14,052
1992
48,547
14,301
1993
55,829
14,554
1994
64,203
14,812
1995
73,833
15,074
1996
84,909
15,341
1997
97,645
15,613
1998
112,291
15,889
1999
129,135
16,170
2000
148,505
16,456
2001
170,781
16,747
2002
196,398
17,044
2003
225,858
17,346
2004
259,737
17,653
2005
298,698
17,965
2006
343,502
18,283
2007
395,027
18,607
2008
454,282
18,936
2009
522,424
19,271
2010
600,787
19,612
2011
690,905
19,959
2012
794,541
20,312
2013
913,722
20,672
2014
1,050,781
21,038
2015
1,833,413
32,484
2016
9,264,384
145,261
2017
10,041,070
139,327
Total:
$ 29,873,683
$ 1,268,744
*701 II. Discounted Costs
Year
Nominal Cost
1982 Present Value
1982
[2] $ (1,170,000)
$ (1,170,000)
1983
[3] (1,287,000)
(1,138,938)
Total
Costs:
$ (2,457,000)
$ (2,308,938)
III. Discounted Net Cash-flow
Discounted Receipts:
$ 1,268,744
Discounted Costs:
(2,308,938)
Discounted Net Cash-flow
$ (1,040,194)
Footnotes
1. However, any unpaid balance or accrued interest was due and payable on Dec. 31, 2005.↩
2. Under the terms of the management agreement between CEA and AEC, entered into on Dec. 15, 1980, AEC agreed, among other things, to supervise the installation and management of the equipment, to service and maintain the equipment, to calculate the GSF's and Progress' energy savings, and to handle all billing and collection of the proper percentage of those savings.↩
3. The Harmonic offering memorandum states that, if all projections are met, the purchase price would be $ 22,015,404, consisting of (1) $ 960,000 in cash, (2) a $ 288,000 credit (paid for the option), and (3) a $ 20,767,404 nonrecourse note, bearing interest at 10 percent per annum, due Dec. 10, 2017, payable solely from 85 percent of Harmonic's gross rental receipts (excluding management fees and sales tax).↩
4. Under the terms of the management agreement between Harmonic and Kenergy, Kenergy agreed, among other things, to supervise management and installment of the NRM equipment, to service and maintain the NRM equipment, to calculate NRM's energy savings, and to handle all billing and collection of the proper percentage of those savings.↩
5. While sec. 183, on its face, would seem applicable only to individuals or S corporations, it is undisputed that the requirement of a profit objective applies to a partnership, when an individual is a member of such partnership, and claims deductions on account thereof. See Hulter v. Commissioner, 91 T.C. 371, 392 (1988); Brannen v. Commissioner, 78 T.C. 471, 505 (1982), affd. 722 F.2d 695↩ (11th Cir. 1984).
6. Unless otherwise stated, all discussions and computations of cash-flows will disregard tax considerations.↩
7. One dollar received at the beginning of year 0, for example, is more valuable than $ 1 to be received at the beginning of year 1, because the dollar received at the beginning of year 0 can be invested, earning interest during the interim. At an interest rate of 10 percent (unless otherwise stated, all hypotheticals will assume a risk-free, 10 percent annual rate of interest and will ignore the effect of income taxes), the recipient of $ 1 at the beginning of year 0 would have $ 1.10 at the beginning of year 1. A reasonable investor, given the choice between receiving $ 1 at the beginning of year 0 or $ 1.10 at the beginning of year 1, generally would be indifferent, because those rights have equivalent value. For that reason, it is said that the present value, at the beginning of year 0, of $ 1.10 to be received at the beginning of year 1 is $ 1. Likewise, the present value, at the beginning of year 0, of $ 1 to be received at the beginning of year 1 is approximately $ 0.91. To determine the present value of a single future payment, the amount of that payment is divided by the sum (1 + i)<n>, where i equals the appropriate interest (discount) rate and n equals the number of periods (amount of time) to be taken into account. PV = CF / (1 + i)<n>. (CF stands for "cash flow".)↩
8. At a given interest (discount) rate, NPV = CF[0] + CF[1] / (1 + i)<1> + CF[2] / (1 + i)<2> + * * * + CF[n] / (i + 1)<N>. ↩
9. Suppose that X pays $ 1.05 to Y, at the beginning of year 0, in consideration of Y's promise to pay to X $ 1.10 at the beginning of year 1. At first blush, the investment would appear to be attractive to X, with X earning an ostensible profit of $ 0.05. Taking account of the time value of money, however, makes it clear that deal is unattractive (unprofitable) to X, assuming that X has the alternative of investing his money for a 10-percent return. Thus, recall that the present value, at the beginning of year 0, of $ 1.10 to be received at the beginning of year 1 is $ 1. By paying $ 1.05 for the right to receive $ 1.10 at the beginning of year 1, which right is only worth $ 1, X overpays by $ 0.05. For that reason, it is said that the net present value of the investment is negative, or that the investment has a discounted present value of negative $ 0.05 (negative $ 1.05 plus positive $ 1 = negative $ 0.05).↩
10. Petitioners have not suggested that either partnership's cost of financing the equipment in question was particularly advantageous, so that, in effect, we should discount negative cash flows on account of financing at higher rate of interest than we apply in discounting positive cash flows.↩
11. As the interest (discount) rate increases, the present value of a given future cash flow decreases. Thus, the amount a profit-seeking investor would pay out in the expectation of a given future return decreases as the interest rate he could expect to earn increases, because of his assumption of greater risk. Looked at in a slightly different way, the riskier the investment, the greater the discount rate a profit-seeking investor would assume in determining the net present value of future returns. Clearly, a risky investment that tests unprofitable with the assumption of a risk-free rate of return could not test profitable if the rate of return were increased to reflect a more realistic risk.↩
12. As stated above, this calculation assumes an 11.5-percent discount rate, the benchmark rate of return on long-term U.S. Government bonds. If a 12.5-percent discount rate were applied, reflecting a minimal 1-percent premium to compensate for the additional risk involved, CEA's net cash flow would be negative $ 112,656.↩
13. Subjective value to the user and fair market value are distinct concepts. If, for example, a light switch can be purchased on the market for $ 5 (but not less), that is its fair market value, even if the savings generated by that light switch are $ 300 in a given case.↩
1. This figure takes into account management fees and payments to Danison. This figure comprises a guaranteed rent payment of $ 1,026,000 and an option purchase payment of $ 144,000. [2]↩ A discount rate of 11.5 percent is assumed.
1. A discount rate of 13 percent is assumed.↩
3. This figure comprises a guaranteed rent payment of $ 1,026,000 and an option purchase payment of $ 144,000, plus 10-percent interest on each of those amounts.↩